Lanteen Laboratories, Inc., Appellant, v. Percy L. Clark, Jr., Trading as Clinic Supply Company, Appellee.

Gen. No. 39,352.

Opinion filed March 11, 1938.

DEFREES, BUCKINGHAM, JONES & HOFFMAN, of Chicago, for appellant; DON KENNETH JONES and CHAS. O. BUTLER, both of Chicago, of counsel.

CHARLES F. MURRAY, of Chicago, for appellee; B. W. ROSENSTONE and D. R. MURRAY, both of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

This is a complaint in the nature of a bill for specific performance of certain provisions of a written contract for services to be rendered to plaintiff by defendant and his brother, John Clark. Plaintiff appeals from a decree dismissing its complaint for want of equity.

At the request of the parties the trial court appointed a patent attorney, practicing at the Chicago bar, "a special commissioner in chancery with all the

powers of a master in chancery.'' After a hearing the commissioner filed a report recommending that the temporary restraining order that had been entered should be dissolved and the complaint dismissed for want of equity. The decree entered accords with the recommendations of the commissioner.

The commissioner found that at the time the written contract was executed "plaintiff was engaged in the sale of devices and preparations for use by women for birth control purposes,'' and that defendant and his brother were engaged in a like business. The contract required defendant and his brother to render services in the experimental development of rubber tampons or diaphragms for use by women for contraceptive purposes, and provided that they would assign to plaintiff, at its request, any and all patent applications relating to said articles which either or both of them might file during said employment and for a period of five years thereafter; and that they "agree to refrain either directly or indirectly from competing with'' plaintiff "in the manufacture and sale of inflatable and insertable tampons during their period of employment . . . or within five years thereafter, provided, however, that the said John Clark and Percy Clark shall have the right to make and sell during such period diaphragms of the type which they are now engaged in making, *or any type not including the idea of inflation.*'' The only change made in the contract as it was prepared by plaintiff's attorney was the insertion of the italicized words, which were substituted, at the request of defendant and his brother, for the following words, "namely, only cup shaped diaphragms having a single wall.'' The active employment of defendant under the contract terminated about August 1, 1931, and on November 2, 1935, he filed an application for a patent for "a pessary or vaginal diaphragm and an applictor therefor . . . . One of the objects of the

present invention is to provide a device of the character described that will be, to a certain extent, universally adaptable, so far as size and location of the organs is concerned." Plaintiff contended before the commissioner, and contends here, that the application covered an invention "such as the contract contemplated and hence should be assigned to the plaintiff," and that this suit was instituted after defendant refused to assign the application. While defendant was engaged in experimental work, under the contract, a contraceptive, called by plaintiff "Lanteen Browns," was "developed," and placed on the market by plaintiff in December, 1931, or early in January, 1932. It was designed to be sold "through drug channels," and was so sold. Plaintiff obtained a patent on this article.

The special commissioner was appointed because the parties regarded him as learned in the matter of patents. He states that he had the benefit of able briefs of counsel and that after giving careful consideration to the arguments and the evidence he reached the conclusion that the contract between the parties did not cover the device for which defendant had filed the application for a patent. The trial court reached the same conclusion. We agree with the conclusion reached by the commissioner and the trial court.

Both parties to this suit are engaged in the sale of contraceptives, and the question as to whether or not the contract was against public policy was not raised nor suggested in the trial court nor here, but, as we are of the opinion that the contract is tainted with illegality, we will, *sua sponte,* raise that question, for if we ignored it, it might be reasonably assumed that we considered the contract a legal one. The bold position assumed by plaintiff in this court challenges our attention.

In plaintiff's brief its counsel make the following statement as to the history of the relationship between the parties, the character and purpose of the contraceptive plaintiff desired defendant to design, and the manner in which plaintiff proposed to sell the article, if one were designed: "For about two years prior to November, 1930, plaintiff, Lanteen Laboratories had been engaged in the sale of devices and preparations for birth control purposes. . . . Plaintiff opened a clinic about January 1, 1929 (which is still in operation), staffed by women physicians and registered nurses who made individual vaginal examinations of thousands of women patients yearly to determine which size of hemispherical diaphragm was best adapted to each patient. It was impossible to fit all patients with one size of diaphragm; in fact it was necessary to use about twenty different sizes of hemispherical diaphragms whose diameter ranged from 50 to 95 millimeters ($2\frac{1}{8}$ to $3\frac{3}{4}$ inches), in order to provide accurate and satisfactory fittings. Plaintiff's president had previously made an exhaustive study of medical literature pertaining both to the anatomy of the vagina and surrounding organs and to contraceptive methods and devices. He directed the technique employed at the clinic and received daily reports in writing and held many conferences with the clinic staff regarding the problems encountered. Through his study of the subject and the information he acquired from the operation of the clinic, plaintiff's president learned that only about two to five per cent of the patients interested in acquiring birth control information were willing to apply for this information to a physician because of hesitancy in submitting to the then necessary vaginal examination. Plaintiff's president perceived that there was a distinct need for a contraceptive device that would have a dependability at least

equal to that provided by a hemispherical diaphragm, yet could be made and sold in one size only and so designed as to be able to fit the varying anatomies of a large percentage of all women. Such a device, he believed, could be marketed through the drug stores where the public customarily buys large quantities of medical and personal supplies over the counter. If such a device could be so designed that it would not require individual fitting, women desiring this birth control device could acquire it without the embarrassment of a vaginal examination, simply by buying it in drug stores. The plaintiff's president, Mr. Riddlesbarger, did not know at the outset just how such a universal fitting diaphragm should be constructed, but he proposed to have a series of experimental models made, have each model tested at the clinic and utilize the information so gained to modify the design of subsequent models until he could arrive at, if possible, a diaphragm design which would be universally adaptable to normal anatomies and suitable for sale in drug stores. Since Lanteen Laboratories had no equipment for, or men experienced in the manufacture of rubber diaphragms, the Clark brothers, who possessed a modest amount of equipment and experience in this field, were retained by plaintiff to mold the various experimental rubber models which Mr. Riddlesbarger contemplated would be needed in the course of his efforts to produce a universal fitting diaphragm. Mr. Riddlesbarger explained to the Clark brothers, before they signed the contract on November 13, 1930, that he was attempting to design and perfect a universal fitting diaphragm.'' Counsel further state ''that the object of the contract was to develop, if possible, for marketing through drug channels, a universal fitting diaphragm''; that the patent application of defendant covers an invention such as the contract contemplated; that it is superior in design to ''Lanteen Browns'' and should be assigned to plaintiff. The counsel further

state, and the proof shows, that practically all of plaintiff's sales of "Lanteen Browns" diaphragms were made through drug stores and that the sales were increasing yearly. The president of the corporation testified that in four years the sales increased from 5,000 a year to 112,000 a year; that "more than ninety per cent were sold through drug stores." In a letter written by plaintiff to defendant and John Clark shortly after the contract was signed, it is stated that any "patentable item" developed by defendant and John Clark would be added to the "Lanteen line" and sold "through drug channels."

There is present, therefore, a case where the subject matter of the contract was the invention, if possible, of a contraceptive that would do away with the necessity of women consulting physicians or clinics in respect to the use of contraceptives—of an article that could be sold through drug stores to *any* woman, married or single, who called for it. Neither the woman nor the druggist would be required to make any inquiries or statements in reference to the article or its proposed use. No direction or prescription from a physician showing that the article was to be used for the cure or prevention of disease would be required. Plaintiff's brief frankly states that the nature of the contraceptive and the manner in which it was to be sold would enable a woman to buy the article as she would "medical and personal supplies, over the counter." Plaintiff's president testified: "I have continued to sell Lanteen Browns since December, 1931, through drug channels. . . . I have never yet heard of a druggist even suggesting that he make a fitting . . . . The women merely come in and buy these things over the counter the same as they buy other drug supplies." The literature given with plaintiff's contraceptive, thus sold, shocks one's sense of decency. It will be noted that the "Lanteen Laboratories" were conducted merely "to determine *which size* of dia-

phragm was best adapted to each patient." The so-called "Laboratories" had an entirely different purpose than a clinic where a physician determines whether or not it is necessary for a woman to use a contraceptive to cure or prevent disease. In the scheme of plaintiff physicians and clinics were eliminated.

Will equity aid plaintiff under the record in this case? Neither religious beliefs nor sociological views can have any weight in the determination of the question.

The national public policy in the matter of contraceptives is clear. The Criminal Code of the United States (18 U. S. C. A., p. 95, sec. 334—Criminal Code, sec. 211, amended) provides: "Every obscene, lewd, or lascivious, and every filthy book, . . . and every article or thing designed, adapted, or intended for preventing conception or producing abortion, or for any indecent or immoral use; and every article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for preventing conception or producing abortion, or for any indecent or immoral purpose; and every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of the hereinbefore-mentioned matters, articles, or things may be obtained or made, or where or by whom any act or operation of any kind for the procuring or producing of abortion will be done or performed, or how or by what means conception may be prevented or abortion produced, whether sealed or unsealed; . . . and every paper, writing, advertisement, or representation that any article, instrument, substance, drug, medicine, or thing may, or can, be used or applied for preventing conception or producing abortion, or for any indecent or immoral purpose; and every description calculated to in-

duce or incite a person to so use or apply any such article, instrument, substance, drug, medicine, or thing, is hereby declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier. Whoever shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything declared by this section to be nonmailable, or shall knowingly take, or cause the same to be taken, from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $5,000, or imprisoned not more than five years, or both. . . .'' This section, commonly known as the Comstock Law, has been on the statute book for 65 years, and despite repeated efforts to have the law amended or modified, Congress has refused to change it. See 18 U. S. C. A., p. 96, Criminal Code, where the codifier states that any changes made in the original act were designed to perfect the law so that its provisions could not be evaded. Section 305(a) of the Tariff Act of 1930, 19 U. S. C. A., sec. 1305(a), provides that: ''All persons are prohibited from importing into the United States from any foreign country . . . any article whatever for the prevention of conception or for causing unlawful abortion.'' *United States v. One Package* (C. C. A.), 86 F. (2d) 737, involved libel by the United States for the forfeiture of a package containing 120 rubber pessaries, articles to prevent conception, which were imported into the United States by Dr. Stone, claimant. It was conceded that the articles were imported by the physician for the purpose of using them in her own practice. The court held that section 305(a) did not bar articles employed by physicians in the practice of their profession in preventing conception to protect patients' health or save them from infection. The opinion concedes that in so holding the court is departing from the letter of the law,

and the concurring opinion of Judge Learned Hand
makes this fact clear. Dr. Stone was a resident of
New York, and the court, by way of justifying its inter-
pretation of section 305(a), referred to the fact that
"the New York Penal Law [sec. 1142] which makes it
in general a misdemeanor to sell or give away or to
advertise or offer for sale any articles for the preven-
tion of conception excepts [sec. 1145] furnishing such
articles to physicians who may in good faith prescribe
their use for the cure or prevention of disease," citing
*People v. Sanger*, 222 N. Y. 192, where the defendant
was convicted of a violation of section 1142 of the New
York code. The defendant, a noted advocate of birth
control, was not a physician, and the conviction was
sustained. The New York court held that section 1145
was "broad enough to protect the physician who in
good faith gives such help or advice to a married per-
son to cure or prevent disease," and added that "the
protection thus afforded the physician would also ex-
tend to the druggist, or vendor, acting upon the physi-
cian's prescription or order." This statement as to
the druggist or vendor was pure *dictum,* and was so
considered in a later case (*Youngs Rubber Corp. v.
C. I. Lee & Co.* (C. C. A.), 45 F. (2d) 103, 107). The
defendant (Sanger) conceded, in effect, that section
1142 was "within the police power of the legislature,
for the benefit of the morals and health of the com-
munity," and that such law would be constitutional
provided that the section did not apply to duly licensed
physicians. While it has been held that in a prosecu-
tion under section 334 (18 U. S. C. A., p. 95) it is not
only necessary to prove that the article mailed was
designed and adapted for contraceptive purposes, but
that it was also intended for preventing conception,
nevertheless, the public policy of the United States as
expressed in section 334 has never been changed by
Congress. After the federal statute was enacted a

majority of the States passed statutes designed to prevent the sale of contraceptives. A book introduced as an exhibit in the instant case by defendant (Contraception—Stopes) contains the following (pp. 354–355) : "Following the Federal Act of 1873 [Comstock Act] there was an epidemic of State laws on this subject, mostly modelled closely on the Federal law, until now there are only two States in the Union which have not some sort of 'obscenity' statute. These relatively free States are North Carolina and New Mexico. The Federal Act was not only a very prolific ancestor of all these State laws, but there was an extraordinary family likeness in the progeny. In half the States, the giving of contraceptive knowledge is definitely listed as a crime. In the other half of the States, by virtue of the Federal precedent, courts can declare it a crime to impart this knowledge."

Sections 4226 and 4227 of the ordinances of the City of Chicago (Revised Chicago Code, 1931, pp. 1515 and 1516) prohibit the sale, giving away or transporting of books, pamphlets, etc., upon the streets, sidewalks, parks, etc., of the city, giving information as to "articles or means of preventing conception." Section 4228 (p. 1516) prohibits the publication and circulation of advertisements, in the city, giving information "for the purpose of preventing conception." Sec. 223 of the Illinois Criminal Code (par. 468, ch. 38, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 37.418]) provides : "Whoever brings, or causes to be brought into this state, for sale or exhibition, or shall sell or offer to sell, or shall give away or offer to give away, or have in his possession, with or without intent to sell or give away, any obscene and indecent book, . . . *model, cast, instrument or article of indecent or immoral use,* or shall advertise the same for sale, or write or cause to be written, or print or cause to be printed, any circular, handbill, card, book, pamphlet, advertisement or no-

tice of any kind, or shall give information orally, stating when, how, or of whom, or by what means any of the said indecent and obscene articles and things hereinbefore mentioned can be purchased or otherwise obtained, or shall manufacture, draw and expose, or draw with intent to sell, or to have sold, or print any such articles, shall be confined in the county jail . . . or be fined . . . ." While this section does not mention articles to prevent conception, it includes ". . . any . . . instrument or article *of indecent or immoral use.*" Section 334 of the Federal Act (18 U. S. C. A., p. 95) provides: "and every article or thing designed, adapted, or intended for preventing conception . . . or for *any indecent or immoral use.*" That section places contraceptives in the class of articles for "any indecent or immoral use." It has been frequently held that the purpose of section 334 was to exclude from the mails publications and articles deemed injurious to the public morals. In view of the subject matter of the contract in the instant case and the manner in which the article was to be sold, it seems clear that if one were to use the mails to deliver the contraceptive in question to drug stores, to be sold in the manner planned by plaintiff, he would be guilty, under section 334; and, in our judgment, section 223 of the Criminal Code of Illinois is certainly broad enough to cover indiscriminate sales of contraceptives through drug stores. It certainly could not be reasonably contended that sales so made might not tend to corrupt the morals of young, unmarried persons. Would not the indiscriminate sale of the contraceptives to such persons, therefore, constitute the sale of an "article of indecent or immoral use?" "The maxim that he who comes into equity must come with clean hands, or, as it is frequently expressed, that he who has done iniquity shall not have equity, or that he who has done inequity, or has not done equity, cannot have equity, is

of ancient origin, and broad application. It is the expression of the elementary and fundamental conception of equity jurisprudence. . . ." (21 C. J. 180, sec. 163.) A very anomalous proceeding was presented in the instant case when equity opened its door to settle the dispute between these sordid traffickers in contraceptives. But as the trial court dismissed plaintiff's bill the decree will be affirmed.

The decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

FRIEND, P. J., and SULLIVAN, J., concur.